**In re Billie E. MICHAEL and Lorrie A. Michael, Debtors.**

**Insouth Bank, Plaintiff,**

v.

**Billie E. Michael and Lorrie A. Michael, Defendants.**

**Bankruptcy No. 00–21489–DSK. Adversary No. 00–0345.**

United States Bankruptcy Court, W.D. Tennessee, Western Division.

Aug. 9, 2001.

Russell Savory, Memphis, TN, for plaintiff.

James E. Bailey, III, Thomas H. Fulton, Memphis, TN, for defendants.

Norman P. Hagemeyer, Memphis, TN, Chapter 7 Trustee.

**MEMORANDUM AND ORDER RE "PLAINTIFF'S COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT ..." COMBINED WITH NOTICE OF THE ENTRY THEREOF**

DAVID S. KENNEDY, Chief Judge.

This adversary proceeding arises out of a complaint filed by the plaintiff, Insouth Bank ("Plaintiff"), against the defendants, Billie E. and Lorrie A. Michael, the above named-debtors ("Debtors"), seeking a nondischargeable judgment in the approximate amount of $101,500 under 11 U.S.C. § 523(a)(2)(B) and Fed.R.Bankr.P. 4007(a).

By virtue of 28 U.S.C. § 157(b)(2)(I) this is a core proceeding. The court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(a) and Miscell. Order No. 84–30 (W.D.Tenn.) entered on July 11, 1984. Based on statements of counsel, the oral testimony adduced at the trial, the six trial exhibits, and the case record as a whole, the court makes the following findings of fact and conclusions of law in accordance with Fed.R.Bankr.P. 7052.

The relevant background facts may be briefly summarized as follows. In 1994, the debtors, along with a third party, formed a forklift repair business named Industrial Repair Service, LLC. Although the debtors dealt with the plaintiff's predecessor banks, the banking relationship between the plaintiff and the debtors began in 1997. Subsequently, the debtors started experiencing severe financial difficulties while maintaining close communications with the plaintiff's representatives in an effort to satisfy substantial loan defaults incurred by the debtor. More specifically, the debtors contacted the plaintiff on multiple occasions in July and August, 1999, disclosing that they had begun intensive efforts with a financial consultant as well as a liquidation service in order to restructure the finances of their forklift business or simply to liquidate and pay off substantial liabilities to the extent possible. Meanwhile, the debtors sought outside employment in the form of a small sign transportation hauling service.

On September 16, 1999, the plaintiff refinanced/restructured the two secured loans with the debtors, namely a commercial promissory note for $48,531.14 and a

consumer note in the principal amount of $135,000. The details of this transaction were manifested by the Trial Exhibits Nos. 1, 2, 3, 4, 5, and 6. Particularly, the debtors submitted a financial statement (Trial Exhibit No. 1) in connection with the restructuring transaction. It is expressly emphasized that the debtors' financial statement failed to list any expenses or personal property and also grossly overstated their annual income as $156,000. A representative of the plaintiff, not the debtors, actually filled out the financial statement. Plaintiff states that the debtors provided the information for the financial statement, and that the plaintiff primarily relied upon the debtors' annual income in restructuring the two loans. Debtors testified at the trial that they, *inter alia*, "had no clue" and were "flabbergasted" concerning how the plaintiff arrived at such a large annual income figure on the personal financial statement.

On February 4, 2000, the debtors filed a joint voluntary petition under chapter 7 of the Bankruptcy Code. The instant complaint to determine the dischargeability of the plaintiff's particular debts was timely filed on May 19, 2000, under 11 U.S.C. §§ 523(a)(2)(B) and 727(a). Subject to the requirements of FED.R.BANKR.P. 7041, the plaintiff's complaint under section 727(a), objecting to the debtors' general discharge, was voluntarily dismissed in an order dated July 16, 2001. No party in interest or the U.S. Trustee desired to proceed with the objection to discharge as allowed by FED.R.BANKR.P. 7041. By virtue of FED.R.BANKR.P. 4004(c), the debtors' general discharges were entered on May 19, 2000; however, a judicial determination regarding the dischargeability of the plaintiff's particular debts was expressly reserved awaiting the outcome of this proceeding under 11 U.S.C. § 523(a)(2)(B). Therefore, the sole issue before the court in the instant proceeding is the discharge-

ability of the aforementioned debts under 11 U.S.C. § 523(a)(2)(B).

The legal effect of a bankruptcy discharge is grounded upon the public policy of freeing the honest, but unfortunate, debtor from the financial burdens of prepetition debt. *See, e.g., Williams v. United States Fidelity & Guar. Co.,* 236 U.S. 549, 554–55, 35 S.Ct. 289, 59 L.Ed. 713 (1915); *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934). It is in the public and private interest to allow the honest, but unfortunate, debtor to begin a new opportunity in life with a clear field for the future free from the obligations and responsibilities consequent upon financial misfortunes. *Hunt* at 244, 54 S.Ct. 695. *See also* S.Rep. No. 95–989, at 7 (1978), *reprinted in 1978 U.S.C.C.A.N.* 5787, 5793 (indicating that the very heart of the fresh start provisions lies in the section 727 discharge).

The bankruptcy discharge serves, in essence, to release an individual debtor's *in personam* dischargeable obligations and to permanently enjoin creditors from collecting a discharged debt from the debtor. See 11 U.S.C. § 524(a). However, a discharge in bankruptcy is not absolute. *See* 11 U.S.C. §§ 727(a) and 523(a). It is fundamental that a bankruptcy discharge is a privilege and not a constitutional right. *See, e.g., In re Krohn,* 886 F.2d 123 (6th Cir.1989).

The Congress has statutorily excepted particular categories of debt from the discharge. The discharge serves countervailing policy considerations while preserving the integrity of the discharge and the honest, but unfortunate, debtor's fresh start. *See* George H. Singer, *Section 523 of the Bankruptcy Code: The Fundamentals of Nondischargeability in Consumer Bankruptcy,* 71 Am.Bankr.L.J. 325, 326 (1997). Simply put, the nondischargeability of cer-

tain debts, as a policy consideration of the Congress, rises to a higher plane than the granting of a debtor's discharge.

For example, the Congress legislated that the following debts are not subject to discharge: certain taxes; debts obtained by fraud, false pretenses and false misrepresentations; certain unscheduled debts; larceny and embezzlement; alimony and child support; willful and malicious injury to the person or property of another; fines and penalties owed to the government; most student loans; previously scheduled debts that were judicially declared nondischargeable; and debts arising from accidents while under the influence of drugs or alcohol. *See* 11 U.S.C. § 523(a)(1)–(10). Clearly, the congressional policy in requiring full payment of the specific debts delineated in section 523(a) outweighs the debtor's interest in a complete, fresh financial start. *See, e.g., Grogan v. Garner,* 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

Section 523(a)(2)(B) of the Code excludes from discharge certain debts arising out of the debtor's issuance of financial statements and specifically provides as follows:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

\*      \*      \*      \*      \*      \*

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

\*      \*      \*      \*      \*      \*

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive; or [1]

The plaintiff in pursuit of a complaint seeking an exception to discharge under section 523(a)(2)(B) of the Code must satisfy *all* the elements therein by a preponderance of the evidence. *See Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). The failure of the plaintiff to prove any one of the above elements contained in section 523(a)(2)(B) will result in a dismissal of the dischargeability complaint. *In re Prestridge,* 45 B.R. 681, 683 (Bankr.W.D.Tenn. 1985). Exceptions to discharge are to be strictly construed against the objector and liberally in favor of the debtor. *Gleason v. Thaw,* 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1915); *Grogan* at 285 & 287, 111 S.Ct. 654; *see also In re Hayes,* 235 B.R. 885, 891 (Bankr.W.D.Tenn.1999). In fact, this court also has stated that the "[S]tandards as to nondischargeability of debt by reason of fraud must be strictly construed against the objector and liberally in favor of the debtor." *In re Prestridge,* at 684 (Bankr. W.D.Tenn.1985) (citing *Gleason v. Thaw,* 236 U.S. 558, 562, 35 S.Ct. 287, 59 L.Ed. 717 (1915) (stating that the exceptions to discharge even under the former Bank-

---

**1.** *See In re Martin,* 761 F.2d 1163, 1166 (6th Cir.1985) (listing the elements that must be proven in a section 523(a)(2)(B) complaint). *See also* H.R.Rep. No. 95–595, at 129–30 (1977), *reprinted in* 1978 *U.S.C.A.A.N.* 5963, 6090–91 (denoting that the Congress legislated a heightened, yet not a rigorous standard, in section 523(a)(2)(B) primarily aimed at

protecting consumer debtors from abuse by erecting an obstacle for creditors acting in bad faith. Additionally, the Congress legislated with a keen awareness of creditor practices of intentionally obtaining false financial statements as a matter of convenience and, after the fact, commencing a section 523 action to avoid dischargeability).

ruptcy Act of 1898 were drafted with precision best serving the well-known purposes of the bankrupt law); *Sweet v. Ritter Finance Co.,* 263 F.Supp. 540 (W.D.Va. 1967); *In re Hunt,* 30 B.R. 425 (D.Ct. M.D.Tenn.1983)).

■ It is not in dispute that the first element of section 523(a)(2)(B) is met despite the fact that the plaintiff, not the debtors, actually filled out the financial statement form. As long as the written statement is written, signed, adopted or used by the debtor, the basic precondition concerning the writing requirement to the non-dischargeability complaint under section 523(a)(2)(B) is met. *See, e.g., In re Batie,* 995 F.2d 85 (6th Cir.1993); *In re Kerbaugh,* 162 B.R. 255 (Bankr.D.N.D. 1993). Here, both debtors signed the personal financial statement form (Trial Exhibit No. 1) and adopted the content therein after the plaintiff transcribed the information elicited from the debtors during the September 16, 1999, meeting in order for the debtors to procure the refinancing of the loans. Thus, the statutory writing requirement is met.

■ The second statutory element requires that the financial statement be materially false. 11 U.S.C. § 523(a)(2)(B)(i). A statement is materially false if the information offers a substantially untruthful picture of the financial condition of the debtor that affects the creditor's decision to extend credit. *In the Matter of Bogstad,* 779 F.2d 370, 375 (7th Cir.1985). In the instant case, this element is met because the debtors' financial statement grossly overstated their annual income at $156,000, failed to list any of the debtors' expenses, and also omitted all of the debtors' personal properties (*e.g.,* their automobiles).

The third statutory element is not in dispute because the debtors' financial statement clearly represents their financial condition. 11 U.S.C. § 523(a)(2)(B)(ii). It is the fourth and fifth statutory elements that demand thorough analysis and discussion.

■ Under section 523(a)(2)(B)(iii) the plaintiff-creditor must prove *reasonable* reliance on the materially false written statement. *See, e.g., In re Kreps,* 700 F.2d 372 (7th Cir.1983). Exactly what constitutes "reasonable reliance" in compliance with 11 U.S.C. § 523(a)(2)(B)(iii) in relation to a creditor's reliance upon a written financial statement is not statutorily defined by the Code. *In re Barron,* 126 B.R. 255, 259 (Bankr.E.D.Tex.1991). Case law, however, reveals that "reasonable reliance" is to be objectively determined by the fact finder considering the totality of the circumstances. *Id.; In re Figge,* 94 B.R. 654, 665 (Bankr.C.D.Cal.1988); *In re Scarpinito,* 196 B.R. 257 (Bankr.E.D.N.Y. 1996).

■ The determination of the reasonableness of the creditor's reliance on a false statement in writing is judged by utilizing such factors as:

- whether there had been previous business dealings between the debtor and the creditor;

- whether there were any warnings that would alert a reasonably prudent person to the debtor's misrepresentations;

- whether a minimal investigation would have uncovered the inaccuracies in the debtor's financial statement; and

- the creditor's standard practices in evaluating creditworthiness and the standards or customs of the creditor's industry in evaluating credit-

worthiness.[2]

Debtors had rather consistent contact with the plaintiff between 1997 and 1999 as evidenced by the parties' testimony that representatives of the plaintiff made regular visits to the debtors' business premises. Plaintiff's representatives testified about these visits and conversations regarding their collection efforts and their examination of the assets and condition of the debtors' home and business. Mr. Brett Whitley for the plaintiff, testified that he met with the debtors only on one occasion. Debtors testified that they met with Mr. Whitley on numerous occasions. It also is noted that the debtors directly discussed with the plaintiff a possible liquidation of the business prior to the refinancing.

Certainly, it can be stated that under the existing circumstances that one should have seriously questioned the annual income of $156,000 listed on the debtors' financial statement, especially after the debtors failed to pay the plaintiff timely and after the debtors fully revealed to the plaintiff their plans to hire a liquidation consultant. Debtors testified at the trial that they were "flabbergasted" and "had no clue" as to how the plaintiff arrived at the annual income figure of $156,000 listed on the financial statement. As noted, the plaintiff's testimony is contrawise. A minimal inquiry or investigation by the plaintiff, however, would have revealed glaring inaccuracies in the debtors' financial statement. For example, the financial statement failed to list any expenses or personal property of the debtors. Although apparently not available at the time of the refinancing of the two loans,

the debtors' 1998 and 1999 tax returns, (Trial Exhibits Nos. 5 and 6) reveal total income of $18,810.00 and a negative income of ($112,435.00) respectively for those years.

Although no evidence was introduced regarding the industry standard in evaluating creditworthiness in matters such as this one, it is generally held that commercial lending institutions are held to a higher standard and must investigate what courts have described as "red flags" indicating that the debtor's representations in a financial statement were not accurate. *See, e.g., In re Weinstein,* 31 B.R. 804 (Bankr.E.D.N.Y.1983); *In re Misjak,* 26 B.R. 914 (Bankr.W.D.Wis.1983); *Matter of Newmark,* 20 B.R. 842 (Bankr.E.D.N.Y. 1982). Such "red flags" like incomplete or truncated financial information on loan documentation, inaccurate documents consisting of obvious omissions, and stale financial information all constitute part of the reasonable reliance analysis. *Singer* at 349; *see also In re Howard,* 73 B.R. 694, 705–06 (Bankr.N.D.Ind.1987) (citing cases where courts have questioned the reasonableness of a creditor's reliance when financial statements contain inaccuracies, insufficiencies, or omissions on their face, as well as, extensions of credit when the financial statement is not actually relied upon by the creditor who consciously ignores "red flags" or infers that all debts do not need to be listed to extend credit).

Here, the plaintiff prepared or filled out the financial statement for the debtors. Plaintiff's knowledge of the omissions on the financial statement cannot be

---

**2.** 4 COLLIER ON BANKRUPTCY ¶ 523.08[2][d]; *see, e.g., In re Ledford,* 970 F.2d 1556, 1560 (6th Cir.1992) (listing the factors·utilized in making a factual determination under section 523(a)(2)(A) as well as section 523(a)(2)(B) in determining that the creditor's reliance was reasonable in light of the totality of the circumstances); *contrast In re Phillips,* 804 F.2d 930, 933 (6th Cir.1986); *In re Ward,* 857 F.2d 1082, 1084 (6th Cir.1986); *In re Martin,* 761 F.2d 1163, 1166–67 (6th Cir.1985); *Knoxville Teachers Credit Union v. Parkey,* 790 F.2d 490, 492–93 (6th Cir.1986); *In re Garman,* 643 F.2d 1252, 1257–59 (7th Cir.1980).

disputed. The omission of any of the debtors' personal property and expenses certainly renders the financial statement an incomplete composite of the debtors' financial condition. Although the plaintiff obtained an appraisal of the debtors' personal residence, no independent inquiry or investigation was performed regarding the debtors' ability to repay the restructured business loans despite the fact that the debtors revealed that they were engaged in a separate, small business of hauling signs seeking to make ends meet because their forklift business was admittedly struggling financially.

■ Although a lender does not have an independent duty to verify the absolute accuracy of a financial statement; nonetheless, a lender cannot ignore "red flags" and glaring inaccuracies and inconsistencies and later assert reasonable reliance. *In re Kuranda,* 122 B.R. 264, 269 (Bankr. E.D.Va.1990); *In re Bossard,* 74 B.R. 730, 735 (Bankr.N.D.N.Y.1987); *see also In re Compton,* 97 B.R. 970, 979 (Bankr. N.D.Ind.1989); *In re Jackson,* 32 B.R. 549, 552 (Bankr.E.D.Va.1983); *In re Branham,* 126 B.R. 283, 292 (Bankr.S.D.Ohio 1991) (accepting the proposition that a creditor may have a duty to inquire further into a financial statement with glaring inconsistencies or patent defects if its reliance is to be deemed reasonable); *compare In re Ledford,* 970 F.2d 1556 (6th Cir.1992), *cert. denied,* 507 U.S. 916, 113 S.Ct. 1272, 122 L.Ed.2d 667 (1993) (refusing to articulate a wholesale rejection of the duty on the creditor to investigate because the specific circumstances of the case involved a debtor who was a long time customer of the bank, a minimal investigation would not reveal the fraud, and no "red flags" were apparent).

■ In the instant case, however, facts and circumstances existed which imposed a duty upon the plaintiff to further investigate the debtors' financial condition in order to meet the "reasonable reliance" requirement under 523(a)(2)(B)(iii). The fact that the debtors' income was grossly overstated, the failure to list any expenses or personal property on the financial statement, and the plaintiff's actual knowledge of the debtors' inability to pay their financial obligations diminish the plaintiff's assertion that its reliance on the financial statement was reasonable as contemplated under section 523(a)(2)(B)(iii). These facts, known by the plaintiff, compel a commercial creditor to make some threshold and independent inquiry or investigation into such glaring omissions and inaccuracies, including the debtors' large annual income, in order to legitimately assert reasonable reliance arising out of a false financial statement under section 523(a)(2)(B)(iii) when such "red flags" are present. *Kuranda,* at 269; *see also Matter of Bogstad,* 779 F.2d 370, 372 n. 4 (7th Cir.1985); *In re Yeiser,* 2 B.R. 98, 101 (Bankr.M.D.Tenn.1979) (discussing the requirement of "reasonable" reliance added to section 523(a)(2)(B)(iii) by the 1978 Code surely does not mean that a creditor may "... assume the position of an ostrich with its head in the sand and ignore facts which were readily available to it."). Despite the debtors' admissions and candor of difficult financial circumstances expressed directly to the plaintiff, the plaintiff made no such inquiry or investigation into the debtors' annual income. In theory, no matter how badly the debtors may have behaved, section 523(a)(2)(B) requires that the plaintiff, nonetheless, must have *reasonably* relied upon the debtors' financial statement.

Based on the totality of the particular facts and circumstances and applicable law, the court includes that the plaintiff did not reasonably rely on the debtors' financial statement as required under sec-

tion 523(a)(2)(B) of the Code. Because the plaintiff has failed to carry its burden of proof on the reasonable reliance issue, the court finds that the instant complaint should be dismissed. Further inquiry into the final element of section 523(a)(2)(B)(iv)—that the debtor caused or published the statement with the intent to deceive—is not necessary. Accordingly, it also is not necessary for the court to decide which party is actually responsible for the glaring omissions and inaccuracies on the financial statement. The factual determination that the plaintiff's reliance here was not reasonable is, standing alone, sufficient under the existing circumstances to warrant a dismissal of the complaint.

**IT IS ORDERED AND NOTICE IS HEREBY GIVEN:** That the complaint filed by the plaintiff, Insouth Bank, against the defendants, Billie E. and Lorrie A. Michael, under 11 U.S.C. § 523(a)(2)(B), is hereby dismissed.