UNPUBLISHED ORDER
Not to be cited per Circuit Rule 53

# United States Court of Appeals

For the Seventh Circuit
Chicago, Illinois 60604

Submitted May 10, 2005[1]
Decided August 26, 2005

Before

HON. JOEL M. FLAUM, *Chief Judge*

HON. MICHAEL S. KANNE, *Circuit Judge*

HON. ANN CLAIRE WILLIAMS, *Circuit Judge*

No. 03-3153

| | |
|---|---|
| In re JAMES A. HUDGENS and PAMELA HUDGENS, *Debtors-Appellees*, | Appeal from the United States District Court for the Northern District of Indiana, South Bend Division. |
| | No. 3:03 CV 192AS |
| Appeal of: NEW EQUIPMENT LEASING INCORPORATED. | Allen Sharp, *Judge*. |

**O R D E R**

James and Pamela Hudgens ("Debtors") filed for bankruptcy protection under Chapter 7 of the United States Bankruptcy Code. Among the debts for which they sought discharge was a debt owed to New Equipment Leasing ("NEL"). NEL filed a complaint contending that the debt owed to it should not be discharged because the debtors provided a materially false and intentionally deceptive financial statement in order to receive a lease; the debtors made a false oath or account; and the debtors

---

[1]On April 25, 2005, this court granted appellant New Equipment Leasing's motion to waive oral argument. Pursuant to Fed. R. App. P. 34(f), this case was decided on the record and the brief submitted by New Equipment Leasing. The debtors-appellees did not file a brief on appeal.

failed to satisfactorily explain a loss or deficiency of assets.  The bankruptcy court granted judgment in favor of the debtors, and the district court affirmed.  We find that the bankruptcy court's conclusions that the debtors did not submit the financial statement or bankruptcy schedules with an intent to deceive, and that the debtors provided a satisfactory explanation for the deficiency in assets, are not clearly erroneous.  Therefore, as we explain in more detail below, we affirm.

## I.  BACKGROUND

James Hudgens, the sole proprietor of a contracting and excavating business, sought to lease a paver and roller from NEL in April 2000.  At trial, Hudgens testified that Jim Spock, an NEL sales representative, told Hudgens after running his credit report that he had a good credit score, and NEL would approve the lease. Spock then faxed Hudgens a "Personal Statement," a two-page financial statement that asked NEL lease applicants information about their income, net equity, and debts.

Before filling out the Personal Statement, Hudgens asked Spock if NEL wanted to see Hudgens's tax returns, stating to Spock that his tax returns "didn't look good" and had "never showed much of a profit."  Spock told him the tax returns would not be necessary.  Hudgens completed the Personal Statement in approximately one and a half hours and then faxed it back to NEL.  Hudgens listed an income of $60,775 per month on the Personal Statement.  In addition, the Personal Statement listed assets of $710,000 and liabilities of $260,000. (Hudgens's tax returns for the years 1997, 1998, 1999 and 2000, however, stated annual incomes of $25,007, negative $29,702, negative $11,806, and negative $60,420 respectively. When Hudgens filed for bankruptcy about thirteen months after submitting the Personal Statement, he listed total assets of $162,170 and total liabilities of $320,745 on his bankruptcy schedules.)

John Nienhuis, the sales manager with the sole authority to approve leases, received Hudgens's file.  Nienhuis testified that he contacted trade and bank references and ran a credit report on James Hudgens, and the credit report and the references were all favorable.  He also testified that he relied on the Personal Statement when deciding whether to approve the lease.  Nienhuis approved the lease for approximately $35,000 of equipment, to be paid at a rate of $730.79 per month for 60 months.

About a week after receiving the paver and roller, Hudgens injured his knee, rendering him unable to work for eight weeks and bringing business to a halt. Hudgens subsequently defaulted on his lease with NEL.  The roller and paver were repossessed and sold at an auction.  On February 19, 2001, NEL obtained a judgment of $38,326.38 in a Michigan court, reflecting the amount still owed after the sale of the equipment.

Pamela and James Hudgens filed for protection under Chapter 7 of the

United States Bankruptcy Code on May 25, 2001. NEL then filed a complaint objecting to the discharge of Hudgens's debt to NEL. After a trial, the bankruptcy court granted judgment in favor of the debtors, and the debt to NEL was discharged. The district court affirmed the bankruptcy court's decision, and NEL appeals.

## II.  ANALYSIS

"The distinguishing feature of a Chapter 7 proceeding for the individual debtor is the discharge: after surrendering his non-exempt property for the benefit of his creditors, the debtor is discharged from what remains of most of the debts he owed as of the date the bankruptcy petition was filed." *Matter of Turner*, 156 F.3d 713, 717 (7th Cir. 1998) (citing 1 Robert E. Ginsberg & Robert D. Martin, Ginsberg & Martin on Bankruptcy § 12.01, at 12-4 (4th ed. rev. 1998)). The primary purpose of the bankruptcy discharge is to give the debtor a "fresh start." *In re Chambers*, 348 F.3d 650, 653 (7th Cir. 2003).

The benefits of this "fresh start" policy, however, are limited to the "honest but unfortunate debtor." *Peterson v. Scott* (*In re Scott*), 172 F.3d 959, 966-67 (7th Cir. 1999) (citing *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991)), and the Bankruptcy Code provides for exceptions to discharge when a debtor has been less than honest. NEL contends that three provisions preclude discharge of the debt owed to it. First, it argues that the bankruptcy court should have granted an exception to discharge under 11 U.S.C. § 523(a)(2)(B) because, it contends, the debtors submitted a materially false financial statement made with the intent to deceive that NEL reasonably relied on when it granted financing to Hudgens. NEL next argues that 11 U.S.C. § 727(a)(4) bars discharge because the debtors made a false oath either on the Personal Statement or on their bankruptcy schedules. Finally, NEL contends that 11 U.S.C. § 727(a)(5) bars discharge because the debtors did not satisfactorily explain a loss of assets.

We review the district and bankruptcy courts' legal conclusions de novo. *Leibowitz v. Parkway Bank & Trust Co.* (*In re Image Worldwide, Ltd.*), 139 F.3d 574, 576 (7th Cir. 1998). A bankruptcy court's interpretation of the Bankruptcy Code is a legal conclusion that we review de novo. *In re Birkenstock*, 87 F.3d 947, 951 (7th Cir. 1996) (citation omitted). In contrast, we review the bankruptcy court's findings of fact upon which a finding of discharge is predicated only for clear erro. *Id.* That is, we will reverse the bankruptcy court's factual findings only when, although there is evidence to support the findings, we are "left with the definite and firm conviction that a mistake has been committed." *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir.1994) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985)). In keeping with the fresh start goal of bankruptcy, exceptions and objections to discharge from bankruptcy are "'constructed strictly against a creditor and liberally in favor of the debtor.'" *Goldberg Sec., Inc. v. Scarlata* (*In re Scarlata*), 979 F.2d 521, 524 (7th Cir. 1992) (citations omitted); *see also In re Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996) (citations omitted).

## A. 11 U.S.C. § 523(a)(2)(B) does not preclude discharge.

Section 523(a)(2)(B) of the Bankruptcy Code provides that a debtor is not discharged from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by" a statement made in writing

> (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive.

11 U.S.C. § 523(a)(2)(B). A creditor bears the burden of proving by a preponderance of the evidence that a debt meets the statutory requirements for an exception to discharge. *See Grogan*, 498 U.S. at 291; *In re MacFarland*, 84 F.3d 943, 946 (7th Cir. 1996). Therefore, NEL had the burden to prove that the written financial statement Hudgens submitted was: (1) a materially false statement, (2) respecting his financial condition, (3) upon which NEL reasonably relied, and (4) made with the intent to deceive NEL. *See* 11 U.S.C. § 523(a)(2)(B); *see also Ins. Co. of N. Am. v. Cohn*, 54 F.3d 1108, 1114 (3d Cir. 1995). The bankruptcy court concluded that any reliance NEL placed on the financial statement was not reasonable, and, further, that Hudgens did not submit the statement with the intent to deceive.

### 1. Reasonable Reliance

NEL first argues that, contrary to the bankruptcy court's finding, it relied on Hudgens's financial statement when it made the decision to approve Hudgens's lease application. The bankruptcy court looked to Hudgens's testimony that Jim Spock, an NEL sales representative, told Hudgens NEL would approve his lease application solely on his credit report. Hudgens, though, had no first-hand knowledge of what documents NEL actually relied on when it approved the lease. John Nienhuis, whom the bankruptcy court found credible, testified at trial that he had the sole authority to approve Hudgens's financing. Furthermore, he testified, he relied on the financial statement when he approved Hudgens's application. Therefore, although Hudgens testified that he understood he would be approved based on his credit score alone, the uncontroverted evidence in the record is that Nienhuis, the only person with authority to approve the lease, relied on the financial statement when he made the decision to approve the lease. We agree with NEL that it relied, at least in part, on the financial statement when it made the decision to approve the lease.

NEL also contests the bankruptcy court's finding that any reliance it placed on the financial statement was not reasonable. In addition to demonstrating reliance, a creditor must establish by a preponderance of the evidence that its reliance was reasonable in order for a debt to be excepted from discharge under § 523(a)(2)(B). *See* 11 U.S.C. § 523(a)(2)(B)(iii). A bankruptcy court's determination that a creditor's reliance was reasonable or unreasonable is a question of fact that

we review for clear error.  *See In re Morris*, 223 F.3d 548, 553 (7th Cir. 2000).

We analyze the reasonableness of a creditor's reliance on a case-by-case basis.  *In re Bonnett*, 895 F.2d 1155, 1157 (7th Cir. 1989).  During this review, we have recognized that we should not "undertake a subjective evaluation and judgment of a creditor's lending policy and practices," *In re Garman*, 643 F.2d 1252, 1256 (7th Cir. 1980), nor should we use the reasonable reliance requirement to "second-guess a creditor's lending decisions." *Morris*, 223 F.3d at 553. Furthermore, this court has stated, "the concept of reasonable reliance does not generally require creditors to conduct an investigation prior to entering into agreements with prospective debtors." *Id.* at 554.  A lender cannot, however, ignore evidence of deceit and expect a court to later grant an exception to the debtor's discharge.  *In re Bogstad*, 779 F.2d 370, 372 n. 4 (7th Cir. 1985).

Although investigation is not generally required, "such a precaution could be the ordinarily prudent choice in circumstances where the creditor admits that it does not believe the representations made by the prospective debtor." *Morris*, 223 F.3d at 554.  Unlike the creditor in *Morris* whose vice president testified to having "reservations" about the debtor's veracity, however, NEL personnel who reviewed the financial statement expressed no doubts about its accuracy and assumed it to be correct.

Reliance may also not be reasonable if a lender "possesses information sufficient to call the representation into question." *Mayer v. Spanel Int'l, Ltd.*, 51 F.3d 670, 676 (7th Cir. 1995).  Here, the bankruptcy court found there were several "red flags" on the financial statement that  would have alerted an ordinarily prudent lender that the representations might not be accurate, pointing to the debtors' reported monthly salary of $40,000, monthly real estate income of $20,000, and ownership of $388,700 in real estate and $187,000 in automobiles.  Noting also that NEL did not have a prior business relationship with Hudgens, the bankruptcy court concluded that the professed annual income of $700,000, assets of $710,000 should have been investigated further.  *See Garman*, 643 F.2d at 1257-59 (long-standing positive business relationship is an indication of reasonableness of reliance).

NEL argues persuasively that the numbers listed on the Personal Statement do not alone raise "red flags" necessary to require further investigation.  It does not seem inconsistent, for example, for a business owner with a reported income of $700,000 to also possess $710,000 in assets.  *Cf. Morris*, 223 F.3d at 553 (creditor's vice president testified that he had "reservations" about Morris's honesty, and the parties' past experience gave the creditor reason to doubt the debtor's representations); *Insouth Bank v. Michael*, 265 B.R. 593, 600 (Bankr. W.D. Tenn., 2001) (creditor had actual knowledge of the debtor's inability to pay and still ignored that "red flag").  To require a creditor to conduct further investigation based solely on the amounts reported here seems close to running counter to our previous

caution that "the concept of reasonable reliance does not generally require creditors to conduct an investigation prior to entering into agreements with prospective debtors." *Morris*, 223 F.3d at 554.

Moreover, NEL did not approve the lease on the debtors' representations alone. Rather, prior to approval, it obtained a credit report, which was positive, and also contacted bank and trade references, who were also positive. We know now that NEL would have been better served had it investigated the representations in the Personal Statement further, but we are hesitant to say that its reliance was unreasonable here.[2]

### 2.  Intent to deceive

Ultimately, however, we reject NEL's argument that § 523(a)(2)(B) precludes discharge because the bankruptcy court's conclusion that NEL did not prove by a preponderance of the evidence that Hudgens acted with the requisite intent to deceive was not clearly erroneous. A creditor can prove intent to deceive through direct evidence. *In re Sheridan*, 57 F.3d 627, 633 (7th Cir. 1995). In addition, intent to deceive may be inferred where "a person knowingly or recklessly makes a false representation which the person knows or should know will induce another to make a loan." *Id.* (citations omitted). A bankruptcy court's determination that a debtor did not act with the intent to deceive is a finding of fact that we review for clear error. *Id.*

NEL first argues that the bankruptcy court improperly used only a "knew or should have known" standard when it analyzed whether the debtors acted with the intent to deceive and failed to consider whether they acted recklessly. NEL correctly asserts that recklessly making a false representation can satisfy the intent to deceive requirement of § 523(a)(2)(B). *See Sheridan*, 57 F.3d at 633 (citing *Garman*, 643 F.2d at 1260-61) (stating intent to deceive may be inferred where "a person knowingly or recklessly makes a false representation which the person knows or should know will induce another to make a loan."). Contrary to NEL's assertion, however, the bankruptcy court did not fail to consider whether the debtors acted recklessly. Rather, it specifically stated in its opinion, "the debtors, believing they were already approved for the lease, filled out the Personal Statement sloppily or carelessly but not deceptively or with a reckless disregard for the truth," and it cited to *Sheridan* for this proposition. We conclude that the bankruptcy court applied the correct legal standard.

NEL also argues that the bankruptcy court's finding that the debtors did not

---

[2]James Hudgens's statement to an NEL representative that his tax returns "didn't look good" may have constituted a "red flag" necessitating further investigation in this case, but the bankruptcy court did not discuss this statement in its discussion of the reasonableness of NEL's reliance.

intend to deceive it was clearly erroneous. In support, it asserts that the magnitude of the alleged misrepresentations demonstrate that Hudgens acted with the intent to deceive when he submitted the Personal Statement. For example, the Personal Statement indicated an annual income of $700,000, while the debtors' tax returns show that their income had actually been negative for that year and the two previous years.

Mindful of our deferential standard of review and the knowledge that the bankruptcy court, unlike us, had the opportunity to observe the witnesses' testimony, we do not find the bankruptcy court's conclusion clearly erroneous. Before Hudgens received the financial statement to complete, an NEL sales representative told him that it was not important in light of his good credit score. Hudgens thus completed the document with the understanding that it was not consequential to the decision. Furthermore, and significantly, before he completed the Personal Statement, Hudgens explicitly told Spock that his tax returns "did not look good" and even offered to show them to Spock. Spock declined this offer. Affirmatively offering to provide his tax returns while stating they "did not look good" suggests that Hudgens did not act with an intent to deceive.

Rather, as the bankruptcy court found, Hudgens was not sophisticated in financial matters and completed the document as best he could, with the understanding that it would not bear on the decision. In addition, the bankruptcy court found that the debtors adequately explained the difference in the amounts listed on the Personal Statement and bankruptcy schedules. Hudgens testified that he was injured shortly after receiving the equipment and could not work, causing a significant drop in income. This injury also caused him to sell most of the equipment he owned and to incur additional bills.

On balance, then, although Hudgens could have been more careful when he completed the Personal Statement, we do not find clearly erroneous the bankruptcy court's conclusion that Hudgens did not act with the intent to deceive NEL when he submitted the Personal Statement. We therefore reject NEL's argument that § 523(a)(2)(B) precludes the debt to NEL from discharge.

## B.    Neither 11 U.S.C. § 727(a)(4) nor § 727(a)(5) precludes discharge.

NEL also contends that the bankruptcy court should have denied Hudgens's request for discharge pursuant to either 11 U.S.C. § 727(a)(4) or § 727(a)(5). As the plaintiff, NEL has the burden of proving that an objection applies by a preponderance of the evidence. *See* Fed. R. Bankr. P. 4005 ("At the trial on a complaint objecting to discharge, the plaintiff has the burden of proving the objection"); *Scott*, 172 F.3d at 966-67.

### 1.    11 U.S.C. § 727(a)(4)(A)

NEL contends that 11 U.S.C. § 727(a)(4) should have precluded discharge. This section provides that a discharge does not apply to a debtor who, among others,

"knowingly and fraudulently, in or in connection with the case . . . made a false oath or account." In order for this section to preclude discharge, NEL must establish by a preponderance of the evidence that: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case. *See, e.g.*, *Lee Supply Corp. v. Agnew* (*In re Agnew*), 818 F.2d 1284, 1289-90 (7th Cir. 1987); *see also Scott*, 172 F.3d at 966-67 (holding preponderance standard applies to 11 U.S.C. § 727(a) objections). A creditor can establish fraudulent intent by showing that the debtor knowingly made a false and material statement. *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998). A showing of reckless disregard for the truth is also sufficient to prove fraudulent intent. *Id.* (citing *In re Yonikus*, 974 F.2d 901, 905 (7th Cir.1992)).

The bankruptcy court treated both the Personal Statement and the bankruptcy schedules as statements under oath. It found that NEL failed to show by a preponderance of the evidence that Hudgens knew the statements in the Personal Statement and bankruptcy schedules were false, and even if they were false, that they were made with fraudulent intent. NEL contends that Hudgens made a false statement under oath on at least one of the documents because the two documents, signed thirteen months apart, contain a difference in net worth of about $450,000.

Like its challenge under § 523(a)(2)(B), NEL's objection under § 727(a)(4) fails because the bankruptcy court's conclusion that Hudgens did not act with fraudulent intent was not clearly erroneous. After hearing the testimony at trial, the bankruptcy court judge concluded that Hudgens provided a credible and more complete picture of the circumstances that led to his loss of assets. For reasons explained in the previous section, the bankruptcy court's conclusion that Hudgens did not submit the Personal Statement with the intent to deceive was not clearly erroneous. In addition, the bankruptcy court's conclusion that Hudgens did not complete the bankruptcy schedules with fraudulent intent is not clearly erroneous, as NEL failed to demonstrate that any of the entries were made with knowledge that they were false or deceptive.

### 2. 11 U.S.C. § 727(a)(5)

Finally, NEL contends that 11 U.S.C. § 727(a)(5) precludes discharge of the debt to NEL. Under this provision, a debtor may be denied a discharge if he or she "fail[s] to explain satisfactorily . . . any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5). A bankruptcy court has "broad power to decline to grant a discharge . . . where the debtor does not adequately explain a shortage, loss, or disappearance of assets." *In re D'Agnese*, 86 F.3d 732, 734 (7th Cir. 1996) (quoting *First Federated*, 698 F.2d at 886). A debtor can violate § 727(a)(5), which unlike § 727(a)(4) does not contain a fraudulent intent requirement, yet still receive a discharge. *Prairie Prod. Credit Ass'n v. Suttles* (*In*

*re Suttles*), 819 F.2d 764, 766 (7th Cir. 1987).

The creditor has the initial burden to establish that there has been a loss or disappearance of assets; then, the burden shifts to the debtor to satisfactorily explain the loss of assets. *First Federated*, 698 F.2d at 886. A satisfactory explanation of a loss of assets "'must consist of more than . . . vague, indefinite, and uncorroborated' assertions by the debtor." *D'Agnese*, 86 F.3d at 734 (quoting *Baum v. Earl Millikin, Inc.*, 359 F.2d 811, 814 (7th Cir. 1966)). Whether a debtor has satisfactorily explained a loss of assets is a question of fact that we review for clear error. *D'Agnese*, 86 F.3d at 734.

First, NEL argues that it was clear error for the bankruptcy judge to find the debtors' explanation of the whereabouts of their assets satisfactory when they did not offer any documentation. In *In re D'Agnese*, 86 F.3d 732 (7th Cir. 1996), on which NEL relies, we found the debtor's explanation of the whereabouts of several valuable assets inadequate because the debtor "failed to provide any documentation or adequate explanation for the missing assets," and we upheld the denial of discharge "based upon the debtor's failure to specifically provide an explanation from which the court could determine how she disposed of the assets." *D'Agnese*, 86 F.3d at 735. *D'Agnese* does not set forth a bright line rule that a debtor must present always present documentation whenever a creditor establishes a loss of assets. Rather, it stands for the proposition that documentation is but one way, albeit a very good way, for a debtor to explain a loss of assets. Like the bankruptcy court, we agree that documentary evidence would have been preferable. There is no bright line rule in our circuit, however, that a debtor must present documentary evidence in order for an explanation of asset loss to be satisfactory.

NEL also argues that even if documentation is not necessary, the debtors' explanation was too vague to be satisfactory. The bankruptcy court found Hudgens credible and believed his explanation that after an injury forced him to stop work, he sold his equipment and filed for bankruptcy. In addition, it pointed to Hudgens's testimony that he prepared the Personal Statement and bankruptcy schedules to the best of his ability. In light of our deferential standard of review, we do not find clearly erroneous the bankruptcy court's finding that the debtors' explanation of the difference in assets was satisfactory.

## III. CONCLUSION

For the reasons stated above, the decision of the district court affirming the decision of the bankruptcy court is AFFIRMED.